# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| GREG WINSKI,                            ) | No. 12 CV 4130 |

GREG WINSKI, )
                     )     No. 12 CV 4130
          Plaintiff,       )
                     )
    v.                      )     Magistrate Judge Young B. Kim
                     )
CAROLYN W. COLVIN, Acting      )
Commissioner, Social Security    )
Administration,[1]            )
                     )     May 30, 2013
          Defendant.     )

## MEMORANDUM OPINION and ORDER

Greg Winski seeks disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, based on his claim that he is unable to work because of debilitating back pain related to degenerative disc disease. After his application was denied in a final decision by the Commissioner of the Social Security Administration, Winski filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Currently before the court is Winski's motion for summary judgment seeking reversal of the Commissioner's decision. For the following reasons, the motion is denied:

### Procedural History

Winski applied for DIB on July 7, 2009, claiming that he became unable to work on March 1, 2009. (Administrative Record ("A.R.") 125.) After his claims were denied initially and upon reconsideration, (id. at 54-58, 61-64), Winski sought and

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

was granted a hearing before an administrative law judge ("ALJ"), (id. at 66-67). The ALJ held a hearing on November 4, 2010, at which Winski and a vocational expert provided testimony. (Id. at 25-43.) On December 17, 2010, the ALJ issued a decision finding that Winski is not disabled within the meaning of the Social Security Act and denying his DIB claim. (Id. at 9-18.) When the Appeals Council denied Winski's request for review, (id. at 1-4), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On May 26, 2012, Winski filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

For 26 years Winski worked as a machinist foreman, performing heavy maintenance work on railroads. (A.R. 173.) Winski suffers from degenerative disc disease and claims that the pain stemming from that condition forced him to stop working in March 2009 at the age of 51. (Id. at 125.) At his November 2010 hearing before an ALJ, Winski presented both documentary and testimonial evidence in support of his claim.

### A.    Medical Evidence

The medical record tracing Winski's back issues includes the results from a series of diagnostic tests conducted to evaluate the condition of his spine. Two MRIs taken in May 1997 showed "minimal" disc space narrowing at the L5/S1 level and moderate disc protrusion at L4-L5. (Id. at 237, 240.) An MRI conducted in July

1997 revealed that Winski's nerve roots were "symmetrical" and that the moderate disc protrusion at L4-L5 suggested "the possibility of a central disc herniation." (Id. at 239.) There is a six-year gap until the next evaluation, an x-ray taken in June 2003 in response to Winski's complaints of hip pain. (Id. at 349.) The x-ray showed "preservation of the joint spaces" and no fractures or soft tissue issues. (Id. at 349-50.) The reviewing physician characterized the lumbar spine radiographs as "unremarkable." (Id. at 350.)

Winski's next MRI took place in May 2004. (Id. at 347.) This test revealed moderate central herniation and mild disc degeneration at L4-L5, minimal compression at L5-S1, and severe disc degeneration at L5-S1. (Id. at 347.) Three days later, Winski visited a chiropractor and reported that he was experiencing sharp pain in his lower back which was aggravated by prolonged sitting. (Id. at 345.) Winski reported a pain level of eight out of ten and said that the pain was interfering with his daily activities. (Id.) The chiropractor recommended that Winski engage in physical therapy. (Id. at 346.)

Four years after visiting the chiropractor, in July 2008, Winski sought emergency-room treatment after exacerbating his back pain while pulling weeds. (Id. at 344.) The attending physician noted that Winski was limping on arrival but was able to walk without assistance. (Id. at 261-62.) The doctor gave Winski an epidural injection and prescriptions for three pain medications, Flexeril, Norco, and Ibuprofen. (Id. at 262.) Winski was discharged in stable condition with the

recommendation that he seek follow-up treatment with his regular doctor.  (Id. at 264.)

Winski next sought treatment for his back pain in the spring of 2009, after he stopped working.  That April, Winski underwent another MRI which revealed mild to moderate changes at the L5-S1 level.  (Id. at 248.)  The report states that the degeneration at that level had only "slightly increased" since the June 2003 x-ray. (Id.)  Two weeks later a physical therapist evaluated Winski, noting that he had not undergone physical therapy in six years.  (Id. at 243.)  The physical therapist recommended that Winski engage in bi-weekly stretching and strengthening sessions for four to eight weeks.  (Id. at 244.)  At the end of May 2009 Winski had another MRI, which revealed normal alignment but shallow disc bulging and moderate bilateral foraminal narrowing at L5-S1 and mild bilateral foraminal narrowing and mild central canal stenosis at L4-L5.  (Id. at 246.)   Between May and June 2009 Winski went to three physical therapy appointments before he stopped attending, reporting that the sessions were not helping him.  (Id. at 273.)

Winski also saw his treating physician, Dr. Mark Reiter, three times during the spring of 2009.  (Id. at 315-16.)  Dr. Reiter's specialty is internal medicine and geriatrics.  (Id. at 286.)  His hand-written reports from these visits are difficult to read, but Dr. Reiter notes that Winski reported low-back pain radiating down his left leg.  (Id. at 316.)  Dr. Reiter gave him prescriptions for two pain medications, Voltaren and Soma.  (Id. at 315.)  In August 2009 Dr. Reiter penned a letter in support of Winski's disability application stating that Winski had suffered from

back pain for 15 years, with the most recent severe exacerbations in 2003 and 2004. (Id. at 286.)  Dr. Reiter reported that "currently he has significant problems with walking, bending, lifting, carrying and travelling" and that "[h]e cannot sit for prolonged periods without developing sciatica."  (Id.)  Four months later, in December 2009, Dr. Reiter submitted a second report on behalf of Winski's claim—this time a spinal disorder form prepared by the state disability agency.  (Id. at 298.)  Dr. Reiter checked a box stating that there is evidence of nerve root compression and noted that Winski exhibited positive straight leg raising results at 45 degrees sitting and at 20 degrees supine.  (Id.)  He wrote that Winski is ambulatory with a mild limp on the left side and that he can stand and walk for approximately five minutes but for less than one block.  (Id. at 300.)  Dr. Reiter noted that his treatments—physical therapy, epidurals, and medication—had been minimally effective.  (Id. at 301.)

Two state consulting doctors also provided opinions with respect to the limiting effects of Winski's disc disease.  In September 2009 consulting physician Dr. Charles Wabner reviewed the medical record and opined that Winski is capable of sitting, standing, or walking with normal breaks for about six hours a day with some postural limitations.  (Id. at 288.)  Dr. Wabner found Winski's complaints to be only partially credible, noting that his "statements about his back pain are consistent with the medical evidence and are credible, but his degree of limitation is not fully consistent with the evidence as [sic] his ability to function."  (Id. at 294.)  Four months later, consulting physician Dr. Reynaldo Gotanco reviewed the file and

agreed with Dr. Wabner that Winski is capable of performing light activity. (Id. at 308.)

The latest treatment records are from the fall of 2010 when Winski underwent yet another MRI. (Id. at 309.) That October 2010 exam revealed moderate degenerative disc space height loss at L5-S1 that appeared "mildly progressed" since the April 2009 exam. (Id.) Winski received a new referral for physical therapy. In a report from an initial assessment in November 2010, Winski's physical therapist reported that he was able to walk without an assistive device, but demonstrated a left lateral trunk lean, entalgic and trendelenburg patterns, forward flexed posture, and decreased trunk rotation and arm swing. (Id. at 319.) She rated his prognosis as "good" and developed a plan for 18 sessions of physical therapy. (Id.)

## B. Winski's Testimony

During the hearing Winski described the nature of his pain and its limiting effects. He testified that his back pain radiates into his buttocks and thighs and makes his legs feel weak. (Id. at 29.) It feels like "constant pressure," as if someone were pushing knuckles into his back. (Id. at 31.) Winski said that the pain got worse in March 2009, so beginning in May of that year, he attended three or four physical therapy sessions. (Id. at 34.) He said that he stopped going because the sessions were painful. (Id.) He testified that from June 2009 until October 2010 he treated the pain with over-the-counter pain medication like Aleve and Tylenol because his prescription medications made him feel dizzy. (Id. at 29, 34-35.)

Winski noted, though, that he had recently seen Dr. Reiter after a 16-month hiatus and had received a new prescription for Meloxicam. (Id. at 29-30, 34.) He did not think the new medication was helping. (Id. at 30.) He reported that he was enrolled to start physical therapy again, but that he wanted to avoid back fusion surgery—which his doctor had put on the table—because he had heard "horror stories" about unsuccessful surgeries. (Id. at 30-31.)

Winski testified that on a typical day he gets up at three or four in the morning because that is when the over-the-counter medication he takes before bed wears off. (Id. at 31.) He goes downstairs and lies on the couch until his wife gets up. (Id.) Winski testified that he does not do many activities during the day, but might help with dishes or go shopping with his wife, leaning on the shopping cart for support while walking through the store. (Id. at 32-33.) He testified that he visits with friends and his mother, but does not have any hobbies. (Id. at 33.) Winski explained that when he sits down he has to brace himself right away to ease the pain, that he can stand for only five to seven minutes before he has to lean over, and that he can only walk for half a block. (Id. at 36.) He said that over the course of a waking day, he lies flat on his back for eight to ten hours, because that position gives him the most pain relief. (Id. at 37.)

## C.    Vocational Expert's Testimony

Vocational Expert ("VE") Rubin Luna answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform. (Id. at 38.) The VE described Winski's past work as a machinist foreman

as having a heavy physical demand. (Id. at 39.) The ALJ asked him to assume someone of Winski's age and work experience with a capacity to perform light work with certain limitations such as only occasionally balancing, stooping, kneeling, crouching, and crawling. (Id. at 39.) The VE testified that such a person could not perform Winski's past work, but could perform unskilled light jobs, such as room service clerk, stock checker, and routing clerk. (Id. at 40.) The VE testified that Winski does not have any skills that would be transferrable to sedentary work. (Id.) When Winski's attorney asked whether someone who can walk only five minutes at a time and for less than a block would be limited to sedentary work, the VE testified that he would. (Id. at 41.) He also testified that someone who had to lie down for an hour or more a day on an unscheduled basis would not be able to perform any work. (Id.)

## D. The ALJ's Decision

After hearing the proffered evidence, the ALJ concluded that Winski is not disabled under sections 216(i) and 223(d) of the Social Security Act. (Id. at 18.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).  If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence."  20 C.F.R. § 404.1520(e).  The ALJ then uses the residual functional capacity ("RFC") to determine at steps four and five whether the claimant can return to his past work or to different available work.  *Id.* § 404.1520(f),(g).

Here, the ALJ found at steps one and two of the analysis that Winski has not worked since March 1, 2009, and that he has a severe impairment in the form of degenerative changes of the lumbar spine.  (A.R. 11.)  At step three, the ALJ concluded that Winski's impairment does not meet or equal Listing 1.04, which covers disorders of the spine.  (Id. at 11-12.)  In explaining her step-three conclusion the ALJ noted that Winski's impairment "does not result in a compromise of a nerve root with nerve root compression" nor "result in an inability to ambulate effectively."  (Id. at 12.)  Moving on to the RFC analysis, the ALJ determined that Winski is capable of performing "less than the full range of light work," with certain additional limitations including only occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling.  (Id.)  In reaching this conclusion the ALJ pointed to what she characterized as Winski's minimal treatment and infrequent doctor visits, as well as her finding that his description of his pain and its limiting effects is only partially credible.  (Id. at 12-15.)  The ALJ

also credited the opinions of the state consulting physicians above the opinion of Dr. Reiter. (Id. at 15-16.)

Turning to steps four and five, the ALJ determined that Winski is not capable of carrying out the heavy physical demands of his past work as a machine foreman, but she concluded that there are jobs that exist in significant numbers in the national economy that he can perform. (Id. at 16-17.) Relying on the VE's testimony, the ALJ decided that Winski could work as a stock checker, room service clerk, or routing clerk. (Id. at 17.) Accordingly, the ALJ concluded that Winski is not disabled and denied his application for DIB. (Id. at 18.)

## Analysis

In his motion for summary judgment, Winski argues that this court should reverse the ALJ's decision because according to him, the ALJ improperly evaluated whether he is presumptively disabled under Listing 1.04 and made several reversible errors in evaluating his credibility and crafting his RFC. This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d

351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## A.    Listing 1.04

Because a claimant with an impairment that meets or equals a listing is presumed to be disabled (ending the need for further inquiry), *see Sullivan v. Zebley*, 493 U.S. 521, 525 (1990), this court will begin with Winski's argument that the ALJ improperly evaluated whether he meets Listing 1.04, which lists the criteria for a disabling spinal disorder, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. A claimant's condition meets or equals Listing 1.04 if there is evidence of "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." (Id.) Alternatively, a claimant's condition may meet Listing 1.04 if it involves lumbar spinal stenosis resulting in, among other things, an "inability to ambulate effectively." *Id.* § 1.04(C). The ALJ considered whether Winski meets these criteria but concluded that he does not, noting that "[n]o treating or examining physician has identified findings equivalent in severity" to Listing 1.04. (A.R. 11-12.) She also determined that his back impairment neither results "in a compromise of a nerve root with nerve root compression" nor causes "an inability to ambulate effectively." (Id. at 12.)

In challenging the ALJ's step-three analysis, Winski argues that the ALJ's explanation is overly cursory and ignores evidence that he does have nerve root compression and an inability to ambulate effectively. (R. 13, Pl.'s Br. at 11-12.) Although Winski is correct that a perfunctory or superficial analysis at step three may require reversal, *see Kastner*, 697 F.3d at 648, it is his burden to show that he meets each of the listing's criteria, *see Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The only support Winski gives to his assertion that the record contains evidence of nerve-root compression is a citation to the spinal disorder form that Dr. Reiter completed on his behalf. (*See* R. 13, Pl.'s Br. at 11 (citing A.R. 298, 300).) There, Dr. Reiter checked the "yes" box for "[e]vidence of nerve root compression (straight leg raising results while sitting and supine)?" (A.R. 298.) He noted that Winski had positive straight leg results at 45 degrees sitting and 20 degrees supine. (Id.) But even taking Dr. Reiter's opinion at face value, it is unclear that his checking the "yes" box supports a finding of listings-level nerve root compression. That is because the form appears to consider only positive straight leg raising results as pertinent evidence of nerve-root compression, while the listings require positive straight leg raising results along with several other criteria, including neuro-anatomic distribution of pain, limited spinal motion, and motor loss characterized by muscle atrophy accompanied by sensory or reflex loss. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04(A). Dr. Reiter left unmarked the box on the form where he could have reported that Winski has "muscle weakness" and made marks indicating that he does not have atrophy in his arms or legs. (A.R. 298, 300.)

Again, Winski must show that he meets all of the criteria for Listing 1.04 to qualify for presumptive disability at step-three. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

It also must be noted that later in her analysis the ALJ explained that she gave little weight to Dr. Reiter's opinion because she considered his view of Winski's limitations to be out of proportion to the objective evidence and based more on Winski's subjective complaints than on any clinical findings. (A.R. 15.) It is proper for this court to consider the ALJ's decision as a whole—taking into account the more thorough discussion that often accompanies the RFC analysis—in deciding whether the listings decision has sufficient support, *see Rice*, 384 F.3d at 370 & n.5; *Molnar v. Astrue*, 395 Fed. App'x 282, 287 (7th Cir. 2010). Winski argues that Dr. Reiter's opinion is entitled to controlling weight because, he says, it is consistent with radiology reports that chronicle the progression of his degenerative disc disease. A treating physician's opinion regarding the severity of a medical condition is entitled to controlling weight "if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *see also* 20 C.F.R. § 404.1527(d)(2). But an ALJ may discount a treating physician's opinion if it is internally inconsistent, contradicts the opinion of a consulting physician, or rests entirely on the claimant's subjective complaints, as long as the ALJ minimally articulates her reasons for doing so. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). That is because the treating physician's opinion may "be unreliable

if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.'" *Ketelboeter*, 550 F.3d at 625 (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)); *see also Scheck*, 357 F.3d at 702 (noting that "it is not unheard of that a personal physician might have been leaning over backwards to support the application for disability benefits" (internal quotation omitted)).

Here the ALJ gave several reasons for discounting Dr. Reiter's view of Winski's condition, all of which find support in the record. She noted that the most recent objective test showed that there had been minimal deterioration in Winski's condition between 2003 and 2009 and yet Winski worked doing a heavy job until he retired from his job in March 2009. (A.R. 14-15.) She also pointed out that Dr. Reiter's opinion is not consistent with the physical therapy reports, a view echoed in Dr. Gotanco's opinion. (Id.) The ALJ further noted that Dr. Reiter's view appears largely based on Winski's subjective complaints. (Id.) Because she articulated her reasons for giving Dr. Reiter's opinion little weight, and because those reasons are supported by the record, the ALJ did not err in giving little weight to the spinal disorder form. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek*, 390 F.3d at 503.

As for Winski's argument that he meets Listing 1.04 because he says he is unable to ambulate effectively, not even Dr. Reiter agrees with that characterization. On the spinal disorder form that supports the majority of Winski's arguments here, Dr. Reiter checked the "no" box next to the question "Non-ambulatory?" and noted that although Winski has a "mild limp" on his left side, he

is able to walk without an assistive device. (A.R. 300.) The listings definition of "inability to ambulate effectively" requires an "extreme limitation of the ability to walk." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b). That generally means "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device." *Id.* Although Dr. Reiter also wrote that Winski can walk for less than five minutes and for less than a block, that report appears to be based on Winski's subjective reports, and so for the reasons just discussed, the ALJ was entitled to give it little weight. *See Ketelboeter*, 550 F.3d at 625. Winski relies heavily on the November 2010 physical therapy report describing his limp and forward flexed posture, but even that report notes that he is ambulatory without an assistive device. (A.R. 319, 328.) In short, Winski has not pointed to record evidence that supports his argument that the ALJ erred in evaluating whether his condition meets or equals Listing 1.04.

## B.     Credibility Analysis

Winski also argues that the ALJ improperly assessed his credibility by relying on boilerplate language and by failing to build a logical bridge between the evidence and her conclusion that his testimony regarding the limiting impact of his impairment was exaggerated. Winski has a particularly high hurdle to overcome here, because this court may only overturn an ALJ's credibility assessment if it is "patently wrong." *See Skarbek*, 390 F.3d at 504-05. That means that this court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Winski "must do more than point to a different conclusion that the ALJ could have

reached." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Put simply, this court will not disturb the ALJ's credibility determination unless it is "unreasonable or unsupported." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Winski first attacks the ALJ's use of the following standard, but oft-criticized boilerplate language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

(A.R. 14.) This language has been criticized by the Seventh Circuit as getting "things backwards," because an ALJ is required to make an independent credibility determination before assessing the claimant's ability to work. *See Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012). This boilerplate suggests that the ALJ disregarded the claimant's testimony because it did not conform to her preconceived view of the RFC. *See id.* But the Seventh Circuit also has made it clear that an ALJ's use of this objectionable language does not amount to reversible error if she "otherwise points to information that justifies [her] credibility determination." *See Pepper*, 712 F.3d at 367-68. In other words, there is no need to reverse based on an ALJ's use of this boilerplate where she gave other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Contrary to Winski's argument, here the ALJ's use of boilerplate does not result in reversible error because she gave a number of supported reasons to explain

her conclusion that his testimony is less than fully credible.  In accordance with SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996), the ALJ considered alongside Winski's statements factors such as his daily activities, treatment, medications, and the objective medical evidence.  She correctly noted that there is a "huge gap" in the treatment record between June 2009 and October 2010 during which time he treated his pain with only Tylenol and Aleve.  (A.R. 14.)  The ALJ reasoned that someone who is as limited as Winski claims he is would likely make more of an effort to see a doctor or obtain stronger pain medications.  (Id.)  The ALJ also found suspicious that Winski never sought treatment from an orthopedist or a pain specialist and attended "limited therapy sessions."  (Id.)  Additionally, she noted that someone who truly spent ten hours of his waking day lying flat on his back would show more weakness and deconditioning than that described in his limited physical therapy reports.  (Id.)  Because the ALJ justified her credibility determination with these supported reasons, her inclusion of the unhelpful boilerplate in her decision does not warrant reversal.  *See Pepper*, 712 F.3d at 367-68.

Winski next argues that the credibility determination lacks the support of the requisite "logical bridge" because, he says, the ALJ's discussion of his medication history is "illogical."  (R. 13, Pl.'s Br. at 9-10.)  Specifically, he attacks the following excerpt from the ALJ's decision:

> The ability of the claimant to take over the counter pain medications of Tylenol and Alleve [sic] without more potent pain relief supports that his pain is not as severe as indicated.  I recognize that claimant had used some prescription pain medications in early 2009 but ceased their

> use after side effects. He recently started Meloxicam a week prior to hearing. However, the claimant never returned for treatment to obtain new medications that may have worked better.

(Id. (quoting A.R. 14).) According to Winski, the ALJ contradicted herself by saying that Winski "never" returned for medication after 2009 when she also acknowledged that he started a new medication a week before the hearing. But this argument calls for the kind of "nit-picking" of the ALJ's decision that the substantial evidence standard of review requires this court to avoid. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (stating that the court must give an ALJ's decision "a commonsensical reading rather than nit-picking at it" (quotation omitted)). A common-sense reading of the ALJ's (perhaps poorly worded) explanation is that she intended to say that Winski did not return for treatment between 2009 and late 2010, not that he "never" returned at all. The gist of the paragraph lies in the ALJ's determination that the more than year-long gap in treatment that started a few months after Winski stopped working and ended the week before the hearing suggests that he exaggerated the extent of his pain.[2] Given an ordinary reading, the paragraph provides the requisite logical bridge between the evidence and the ALJ's credibility determination.

---

[2] To the extent Winski intended to argue that the ALJ erred in failing to consider the side effects of his medication, this argument warrants little attention. Winski testified that he had side effects like dizziness in connection with the medications he stopped taking in 2009. (A.R. 35.) He points to no evidence that he has on-going dizziness or that the Meloxicam he started taking a week before the hearing causes any significant side effects that the ALJ should have incorporated into the credibility analysis. On the contrary, the only side-effect he attributed to Meloxicam at the hearing is one that he described as being "positive." (Id. at 36-37.)

**C.     The RFC Determination**

Winski also challenges the ALJ's finding that he is capable of performing light work with certain postural limitations.  He argues that he is capable of performing no more than sedentary work, and that given his age and skill set, a limitation to sedentary work would result in an award of benefits pursuant to the vocational grid.  (R. 19, Pl.'s Reply at 3.)  Winski's main objection to the RFC appears to rest on his contention that the ALJ erred in failing to give controlling weight to Dr. Reiter's opinion that Winski can sit, stand, and walk for only short periods of time.  (R. 13, Pl.'s Br. at 14.)  For the reasons set forth above in section A, this court concludes that the ALJ properly explained why she discounted his opinion.  Winski also argues that the ALJ assigned too much weight to the opinions of the consulting physicians who, according to him, did not have the "benefit of later radiology and examinations available to Dr. Reiter."  (Id.)  But Dr. Gotanco filled out his RFC evaluation a month after Dr. Reiter filled out the spinal disorder form and Winski has not pointed to any other opinion that Dr. Reiter developed based on the later MRI.   (A.R. 300, 308.)   In other words, there is no reason to think Dr. Reiter's opinion is based on newer evidence than that relied on by the consulting physicians.  Moreover, the newer evidence Winski references is the October 2010 MRI, which shows only mild progression in Winski's disc space height at L5-S1.  (Id. at 309.)  Winski has not developed any argument nor pointed to any evidence to explain how that mild progression renders him unable to perform light work or would alter the consulting physicians' analysis.  Indeed, a month after the October

2010 MRI a physical therapist described Winski's prognosis as being "good" if he complies with prescribed therapy. (Id. at 319.) Accordingly, Winski has not shown that the ALJ committed reversible error in assigning significant weight to the consulting physicians' opinions.

Winski also attacks the ALJ's RFC determination by arguing that she gave short-shrift to important evidence and impermissibly "played doctor" in evaluating his limitations. In particular, Winski considers the November 2010 physical therapy report to provide important evidence of the limiting effects of his pain, because it describes his limp and his reduced range of motion. Winski acknowledges that the ALJ considered this report, but argues that her two-sentence summary of its findings is "extremely laconic" and thus amounts "to a mischaracterization." (R. 13, Pl.'s Br. at 8-9.) But this argument rubs up against the well-settled principle that an ALJ does not need to discuss every piece of record evidence in detail, especially where, as here, the ALJ's discussion is sufficient to assure that she took into account the physical therapist's findings. *See McKinzey*, 641 F.3d at 891. And although Winski is correct that an ALJ may not "play doctor" by making her own independent medical findings, *see Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996), the ALJ's decision here did not cross the line into that impermissible territory. Winski asserts that the ALJ made her own determination that he could have returned to work had he engaged in more treatment, but the ALJ did not say that. Instead, she found that Winski's descriptions of his pain were harder to credit because he did not see a doctor more frequently or seek out

prescription-strength pain medications for more than a year in the lead-up to his hearing. *See Jones*, 623 F.3d at 1161 (recognizing that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration"); *see also* SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996) (tasking the ALJ with evaluating the frequency and duration of treatment in determining the RFC). Winski also faults the ALJ for noting that someone who lies on his back for ten hours a day would likely exhibit a level of muscle deconditioning that is not borne out in the physical therapy reports. But making that common-sense observation—especially in the context of a larger discussion describing why the treatment records are consistent with the RFC—does not amount to the kind of diagnostic speculation an ALJ must avoid. In the end, this court is satisfied that the ALJ gave adequate consideration to the record evidence and reasonably explained how that evidence is consistent with an RFC for light work. Accordingly, Winski has not shown that the RFC determination should be reversed.

## Conclusion

For the foregoing reasons, Winski's motion for summary judgment is denied and the decision of the Commissioner is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**